## IN THE UNITED STATES S STATE COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | |
|---|---|
| **DAVID LAMBERT** | ) |
| **GARY HILL SR.** | ) |
| **LINDA HILL** | ) |
| *Plaintiffs,* | ) |
| | ) |
| **v.** | ) |
| | ) |
| **DEMOCRATIC PARTY OF VIRGINIA,** | ) |
| An unincorporated association | ) |
| **SERVE:  Dwight C. Jones, Chairman** | ) |
| **RETURN FOR THIRD PARTY SERVICE OF PROCESS** | |
| | ) |
| **74TH HOUSE DISTRICT DEMOCRATIC** | ) |
| **NOMINATING COMMITTEE** | |
| **SERVE: Cathy Woodson, Chairwoman** | ) |
| **RETURN FOR THIRD PARTY SERVICE OF PROCESS** | ) |
| *Defendants.* | ) |

Case No. __3 : 15CV0061__

F I L E D

JAN 3 0 2015

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

## COMPLAINT

COMES NOW THE Plaintiffs, David Lambert ("Lambert") and Gary Hill, Sr. ("Gary Hill"), and Linda Hill ("Linda Hill") by counsel, and for their Complaint against the Defendants herein, state the following:

### INTRODUCTION

1.     This case is brought pursuant to 42 U.S.C. § 1983 and § 2 of the Voting Rights Act of 1965, 42 § § 1973 *et seq* to vindicate the rights of voters to participate in the political process and the rights of a candidate to have access to the ballot.

2.     This case presents several federal constitutional challenges, and several challenges to the **Voting Rights Act of 1965**.

3.     As applied to Plaintiffs, and thousands of others, the actions of defendants violated the Political Speech and the Right of Association Clauses of the First Amendment of the Constitution of the United States, the Equal Protection Clause of the 14th Amendment to the Constitution of the United States, the Due Process Clause of the 14th Amendment to the Constitution of the United States and the Fifteenth Amendment to the Constitution of the United States.

4.     As applied to Plaintiffs, and thousands of others, the actions of the defendants violated Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973 *et seq.*

5.     As applied specifically to plaintiff David Lambert (hereinafter "Lambert"), the actions of defendants deprived him of his right to be a candidate in a nomination process as guaranteed by the First and Fourteenth Amendments to the Constitution of the United States.

6.     Plaintiffs bring this action under 42 U.S.C. § § 1983 and 1988, seeking declaratory and injunctive relief from this Court, including such actual or nominal damages as may be shown by the evidence, as well as costs and attorney's fees, an award for such costs and fees being expressly authorized by 42 U.S.C. § 1988, and as to the Voting Rights Act, by 42 U.S.C. § 1973 *l(e).*

7.     Specifically, **the Democratic Party of Virginia** (hereinafter "DPVA") operating through the 74th **House District Democratic Nominating Committee** (hereinafter "Nominating Committee"), conducted an unconstitutional and illegal nomination process to choose the official Democratic Party candidate for the Special Election held on January 13th, 2015, to fill the vacancy in the position of Delegate for the 74th District in the Virginia House of Delegates (hereinafter "Special Election").

8.     The 74th House District of the Virginia House of Delegates (hereinafter "74[th] District") consists of 3 precincts in Charles City County, 26 precincts in Henrico County and one precinct (301) in the City of Richmond. It had been drawn to be a majority-minority legislative district. Upon information and belief from available statistics, nearly 60% of the residents of the 74th District are African American.

9.     The Democratic Party of Virginia Party Plan (hereinafter "Party Plan") authorized the creation of this Nominating Committee.

10.     Upon information and belief, over 99% of all African Americans in the 74th district who are considered members of the DPVA were intentionally disenfranchised and thus knowingly subjected to the consequential discrimination by the actions of Defendants.

11.     Upon information and belief, 100% of all African Americans in the 74th District considered to be part of a separate, identifiable group - African American Democrats who were not members of the official local democratic party committees in Charles City County, Henrico County and the City of Richmond – have been intentionally disenfranchised and thus knowingly subjected to the consequential discrimination by the actions of Defendants.


## JURISDICTION AND VENUE

12.     This is a civil action arising under the laws of the United States. This Court has subject matter jurisdiction over the claims herein asserted pursuant to 28 U.S.C. § 1331. In addition, Plaintiffs seek equitable and other relief under an act of Congress providing for the protection of civil rights, including the right to vote. Thus, this Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343.   The court has jurisdiction over the request for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

13.     Venue is proper for this action in this district and division, pursuant to 28 U.S.C. § 1391(b) and Local Rule (C), in that a substantial part of the events or omissions giving rise to the claim occurred and/or can occur in the future in this district and division.

14.     This Court possess personal jurisdiction over the parties as all reside within this district division.

## PARTIES

15.     Plaintiffs Gary Hill, Sr. ("Gary Hill"), Linda Hill, ("Linda Hill"), and David Lambert ("Lambert"), are African American, citizens of Virginia, and at all times relevant herein were residents and registered voters in the 74th District (hereinafter "Plaintiffs").

16.     Plaintiffs would be considered members of the DPVA as defined in Article 2, § 2.1 Democratic Party of Virginia Party Plan [hereinafter "Party Plan"].

17.     Plaintiff Lambert had been a candidate in a previous contest for the Democratic nomination for Delegate in the 74th District.

18.     Plaintiff Lambert also wanted to be a candidate in the nomination process at issue in this case. However, the required $1500 mandatory, nonrefundable filing fee, and the lack of any alternative means for a candidate to get on the nomination ballot without paying this fee, worked to deny him ballot access.

19.     Plaintiff Lambert intends to be a candidate in the next nomination process to select the Democratic nominee for the position of Delegate in the 74th District.

20.     The Democratic Party of Virginia is the official state party for the Democratic Party of the United States. It had been delegated statutory responsibility under state law for selecting the nomination process to select the official Democratic nominee in the Special

4

Election pursuant to § 24.2-508-10 of the Code of Virginia, 1950, as amended, unless otherwise limited by § 24.2-101 *et seq.*

21.     Defendant Dwight C. Jones is the "state chair" of the DPVA pursuant to Article 4, § 4.11 of the Party Plan. He is the "chief officer" of the DPVA. He is sued in his official capacity.

22.     The 74th House District Democratic Nominating Committee had been created pursuant to the Party Plan to exercise the state power given the DPVA over the nomination process. This Nominating Committee used that power to choose the method of nomination, developing the rules and conducting the process for selecting the official Democratic nominee in the Special Election. The chairwoman was Ms. Cathy Woodson. She is sued in her official capacity.

23.     With respect to all facts and violations alleged in this complaint, Defendants acted under the color of state law.

## BACKGROUND FACTUAL AND LEGAL INFORMATION
### SPECIAL ELECTION SET

24.     The Virginia House of Delegates (hereinafter the "House") is divided into 100 Districts numbered 1-100.

25.     Each District elects one person to serve as a Delegate.

26.     Mr. Joseph D. Morrissey won election to be the Delegate from the 74th District in the general election held on November 5, 2013.

27.     This entitled him to serve a two year term beginning with the convening of the General Assembly in early January of 2014.

28.    The next regularly scheduled election for the 74th District is November 3, 2015. All 100 House districts, along with all 40 seats in the State Senate, will be contested on this date.

29.    On December 18, 2014, Delegate Joseph D. Morrissey submitted a resignation letter to the Clerk of the House of Delegates.

30.    This resignation letter is irrevocable under § 24.2-226 of the Code of Virginia, 1950, as amended.

31.    His resignation became effective on Tuesday, January 13, 2015.

32.    A special election may be called to fill a vacancy in an unexpired term of a member of the General Assembly. The Speaker of the House of Delegates, pursuant to § 24.2-216 of the Code of Virginia, 1950, as amended, issued a writ of election for a Special Election to coincide with Mr. Morrissey's date of resignation, thus guaranteeing representative continuity, as permitted by § 24.2-216 of the Code of Virginia, 1950, as amended.

33.    The Special Election therefore had been called to fill the approximately one year remaining in Mr. Morrissey's unexpired term.

## DEMOCRATS SELECT FIREHOUSE PRIMARY NOMINATION PROCESS

34.    The Constitution of Virginia, Article 2, § 4, gives the General Assembly the sole right to provide for the nomination of all candidates.

35.    § 24.2-508 of the Code of Virginia, 1950, as amended, is a general delegation of public power from the General Assembly to a "political party" allowing said political party to "provide for the nomination of its candidates."

36.     The term "political party" is defined in § 24.2-101 of the Code of Virginia, 1950, as amended. The DPVA, and Republican Party of Virginia, are the only two state parties meeting this definition.

37.     The General Assembly did not accompany this statutory delegation of public power to a non-public entity with any meaningful guidelines, limitations or standards, although this delegation is limited in certain instances by other sections of the Code of Virginia.

38.     The DPVA is the officially sanctioned state organization representing the Democratic Party of the United States.

39.     The Party Plan is the chief governing document for the DPVA.

40.     This Party Plan provided for the DPVA to operate through the Nominating Committee to choose the official DPVA nominee for the Special Election as provided in Article 7, § 7.1-5 and further provided in Article 12, § 12.3 and 12.6,

41.     § 24.2-509 of the Code of Virginia, 1950, as amended, specifically authorized the DPVA, operating through the Nomination Committee, to "determine the method by which" the official Democratic nominee in the Special Election would be chosen.

42.     § 24.2-510 of the Code of Virginia, 1950, as amended, provided the timeline for the DPVA, operating through the Nomination Committee, to complete the chosen nomination process.

43.     On or about December 18, 2014, the DPVA, operating through the Nominating Committee, selected a method of nomination.

44.     The method of nomination, along with the rules governing the selection process, were contained in a document entitled "Call To Caucus."

45.     On December 19, 2014, the DPVA, operating through the Nominating Committee, made the official "Call To Caucus" public.

## HOW THE FIREHOUSE PRIMARY WAS CONDUCTED

46.     While the word "caucus" is used in the Party Plan, not firehouse primary, the "Call To Caucus" said the process of nomination would be an "unassembled caucus (firehouse primary)." The term "firehouse primary" is a generically recognized description for this particular method of a political caucus in Virginia politics (hereinafter "firehouse primary). See e.g., *Miller v. Brown*, 503 F. 3d. 360 (4th Cir. 2007).

47.     The Party Plan states that "[every] resident of the Commonwealth of Virginia who believes in the principles of the Democratic Party is hereby declared a member of the Democratic Party of Virginia" pursuant to Article 2, § 2.1 (hereinafter "Democrats")."

48.     Article 3, Section § 3.1 of the Party Plan, entitled "Full Participation" states the "Democratic Party shall not discriminate on the basis of …race…economic status."

49.     Article 14, § 14.4 of the Party Plan states "[n]o fee of any kind may be charged for the right to attend a vote at a caucus."

50.     Article 9, § 9.3 of the Party Plan, entitled "Full Participation" is another declaration that the "full participation by all Democrats in all phases of…nominating procedures" is to be granted whenever possible.

51.     However the DPVA, operating through the Nominating Committee, despite such implicit promises on how it would use the delegated public power, instead abused this power to disenfranchise and otherwise discriminate against Plaintiffs and many thousands of others similarly situated as described herein. The firehouse primary rules took away the right to vote and disenfranchised all these Democrats – overwhelmingly African American - except for those

considered to be "members in good standing" of either the official local Democratic committee for Charles City County (hereinafter "Charles City Committee"), Henrico County (hereinafter "Henrico County Committee"), or the City of Richmond (hereinafter "Richmond City Committee") as of December 18, 2014.

52.     The DPVA, operating through the Nominating Committee, knew the firehouse primary rules would leave only a handful of local committee officials - approximately 50 – with their right to vote in the nomination process (hereinafter "local committee officials").

53.     Upon information and belief, the DPVA, operating through the Nominating Committee, knew official state statistics at the time the firehouse primary rules were approved showed the 3 Charles City County precincts with 5,325 registered voters, or approximately 10% of the 53,511 registered voters in the 74th District.

54.     Upon information and belief, this 10% figure is consistent with Charles City County's relative proportion of the population in the 74th District.

55.     Upon information and belief, the DPVA, operating through the Nominating Committee, knew official state statistics at the time the firehouse primary rules were approved showed the 26 Henrico County precincts with 46,785 registered voters or approximately 87% of the registered voters in the 74th District.

56.     Upon information and belief, this 87% figure is consistent with Henrico County's relative proportion of the population in the 74th District.

57.     Upon information and belief, the DPVA, operating through the Nominating Committee, knew official state statistics at the time the firehouse primary rules were approved showed the 1 City of Richmond precinct with 1441 registered voters, or approximately 3% of the registered voters in the 74th District.

58.     Upon information and belief, this 3% figure is consistent with the Richmond City's relative proportion of the population in the 74th District.

59.     Upon information and belief, the DPVA, operating through the Nominating Committee, knew the total number of eligible voters in Charles City County had been reduced to approximately 24.

60.     Upon information and belief, the DPVA, operating through the Nominating Committee, knew the total number of eligible voters in Henrico County had been reduced to approximately 27.

61.     Upon information and belief, the DPVA, operating through the Nominating Committee, knew the total number of eligible voters had been reduced to 0 (zero).

62.     The voting statistics for the last election for Delegate in the 74th District, which were available to the DPVA through the Nominating Committee at the time the firehouse primary rules were developed, showed 21,440 votes had been cast for the Democratic nominee in that 2013 election. This was approximately 96% of the total vote cast.

63.     Democrats in Charles City County accounted for approximately 9% - 1959 votes- of total number of votes in 2013.

64.     Democrats in Henrico County accounted for approximately 88% of this total.

65.     Democrats in the City of Richmond accounted for approximately 3% of this total.

66.     The DPVA, operating through the Nominating Committee, knew giving Charles City County near voting parity with Henrico County, given these known statistics, is prohibited by the federal constitution.  See *Gray v Sanders* 372 U.S. 368 (1963). Furthermore, it violates the implicit standard of proportional fairness recognized in Article 15, § 15.1 of the Party Plan.

67.     The DPVA, operating through the Nominating Committee, knew there were approximately 1275 active voters in the City of Richmond residing in the 74th District in precinct 301. They further knew this precinct had voted 99.3% for the Democratic nominee for Delegate in 2013.

68.     Yet the DPVA, operating through the Nominating Committee, knew the firehouse primary rules would take away the right to vote and disenfranchise 100% of these African American Democrats residing in the City of Richmond, since not one was a member in good standing of the Richmond City Committee.

69.     Upon information and belief, at least 10,000 more residents in the 74th House District cast a ballot for the Democratic candidate for President in 2012 than for Delegate in 2013. According to the Party Plan, almost all, or all, of these additional 10000 residents would qualify as members of the DPVA.

70.     At all times, the DPVA, operating through the Nominating Committee, and being familiar with the racial background of the voters in the 74th House District, knew the overwhelming majority of the voters to be disenfranchised and discriminated against were African Americans.

71.     Moreover, at all times, the DPVA, operating through the Nominating Committee, knew the firehouse primary rules would have the penultimate discriminatory effect, inflicting the penultimate voter dilution and disenfranchisement, a 100% total denial of certain First Amendment, Fourteenth Amendment, and Fifteenth Amendment voting and political rights, along with a similar denial of the rights guaranteed by the Voting Rights Act, for an identifiable group of protected voters.

72.     Upon information and belief, the DPVA, operating through the Nominating Committee, knew that membership on the Charles City Committee required paying a mandatory, non-refundable fee.

73.     Upon information and belief, the DPVA, operating through the Nominating Committee, knew that those applying for membership to the Henrico County Committee were expected to pay a fee, although such applicant could request for a fee waiver. Furthermore the DPVA, operating through the Nominating Committee, knew that few such applicants ask for such a fee waiver since admitting to an inability to afford the fee is highly embarrassing.

74.     Upon information and belief, the DPVA, operating through the Nominating Committee, knew that those applying for membership to the Richmond City Committee are expected to pay a fee, although such applicant could request a fee waiver. Furthermore, the DPVA, operating through the Nominating Committee, knew that few such applicants ask for such a fee waiver since admitting to an inability to afford the fee is highly embarrassing.

75.     *Harper v Virginia Board of Elections*, 383 U.S. 663 (1966) banned the use of the poll tax or similar device to deny citizens the right to vote in the election process.

76.     According to *Harper*, a "[s]tate violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or the payment of any fee an electoral standard." *Id*, at 666.

77.     The right to suffrage is fundamental and "any infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964).

78.     Upon information and belief, those applying to join the Henrico County Committee and the Richmond City Committee needed to have their applications approved by the current membership before being allowed to join.

79.     According to the firehouse primary rules, no one could be a candidate for the Democratic nomination for Delegate in the upcoming Special Election unless he or she paid an unreasonable, a mandatory, non-refundable filing fee of $1500.00. The firehouse primary rules failed to provide any alternate means for getting on the ballot.

80.     This unreasonable, mandatory, non-fundable fee of $1500.00 had to be delivered to Ms. Cathy Woodson at the address provide in the "Call To Caucus" by 5:00 PM, Saturday, December 20, 2014.

81.     Plaintiff Lambert's right to have his name on the ballot is protected by the First Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment to the U.S. Constitution and enforced by 42 U.S.C. § 1983. *Anderson v. Celebreeze*, 460 U.S. 780 (1983).

82.     *Bullock v Carter,* 405 U.S. 134, 143 (1972) said "the rights of voters and the rights of candidates do not lend themselves to neat separation." *Bullock* further found that a "filing fee requirement...limited to party primary elections" would be subject to constitutional scrutiny under the "state action" doctrine. *Id,* at 140-141.

83.     Plaintiff Lambert's constitutional right to have access to the ballot without having to pay an unreasonable, mandatory, $1500 filing fee is recognized by Supreme Court in *Lubin v. Panish*, 415 U.S. 709 (1974).

84.     The DPVA, operating through the Nominating Committee, is prohibited from imposing unreasonable and excessive filing fees to shift the cost of the firehouse process to

potential candidates without providing a "reasonable alternative means of access to the ballot." *Bullock,* supra at 149.

85.    In *Lubin,* the U.S. Supreme Court expressly rejected the validity of filing fees as the sole means of determining the "genuineness of a candidacy" or the extent of 'voter support of an aspirant for public office." *Id,* at 717.

86.    A filing fee equal to 1% fee of the annual salary for the public office sought has been deemed constitutionally reasonable in *Brown v. North Carolina State Board of Elections,* 394 F. Supp. 354 (W.D. N.C. 1975).  Filing fees equal to 1-2% of the annual salary for the office sought were seemingly deemed constitutionally reasonable in *Lubin,* supra at 710. A filing fee equal to no more than 1% of the "total salary" to be earned during term of the office sought got implicit backing in *Biener v. Calio,* 361 F. 3d. 206 (2004). The filing fee for the regularly scheduled state run primary in Virginia for DPVA candidates is 2% of the official annual salary pursuant to § 24.2-523 of the Code of Virginia, 1950, as amended.

87.    In the instant case, however, the mandatory filing fee required to get on the firehouse primary ballot equaled approximately 8.5% of the official annual salary without providing any alternate means to get on said ballot.

88.    The DPVA, operating through other nominating committees, regularly uses such unreasonable and excessive mandatory filing fees. For example, last August, the DPVA, operating through the appropriate nominating committee, conducted a firehouse primary to elect the Democratic nominee for a special election to fill a vacancy in the 16th Senatorial District of the Virginia State Senate created by the incumbent's resignation. The filing fee in this 16th Senatorial Democratic firehouse house nomination process equaled nearly 19% of the annual salary.

89.     The term "primary" is defined in § 24.2-101 of the Code of Virginia, 1950, as amended. This statute defines "primary" as "an election held for the purpose of selecting a candidate to be the nominee of a political party for election to office."

90.     The word "election" is defined as a "general, primary or special election by § 24.2-101 of the Code of Virginia, 1950, as amended.

91.     As used in § 24.2-523 of the Code of Virginia, 1950, as amended the term "primary" does not include a "firehouse primary" nomination process. *Miller*, supra at 362.

92.     Thus, this statute does not, as a matter of state law, apply to a party's firehouse primary nomination process.

93.     However the statutes delegating DPVA the power to conduct a firehouse nomination process do not specifically grant the DPVA, operating through the Nominating Committee, the specific power to charge filing fees greater than otherwise provided by state law.

94.     The Due Process Clause of the 14th Amendment requires any such delegation to a private party, such as the DPVA, be accompanied with sufficient limitations on its exercise. See, e.g., *Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 121-122 (1928).

95.     The state cannot allow the private party to control the "price of admission to the electoral process" as the DPVA is permitted to do under Virginia law. *Biener*, supra at 216-217.

96.     In *Biener*, the state legislature provided specific statutory limitations as regards the delegation of power to a political party to charge a filing fee in a party nomination process. No such limitation is present in Virginia law.

## RESULTS OF THE FIREHOUSE PRIMARY

97.     On Monday, December 22, 2014, the DPVA, operating through the Nominating Committee, conducted and supervised the voting in the firehouse primary.

98.     Those few dozen local committee officials permitted to cast a ballot could do so at one location in Charles City County and one location in Henrico County between 7-9 p.m. on that date.

99.     Upon information and belief, the winning candidate received 24 votes of the 42 votes cast by local committee officials.

100.    Upon information and belief, the majority of ballots were cast by members of the Charles City Committee.

101.    Upon information and belief, the winning candidate (Mr. Sullivan) is a member of the Charles City Democratic committee.

102.    Upon information and belief, no Democrat voter in Richmond was actually permitted to vote in the December 22, 2014, firehouse primary balloting.

103.    Upon information and belief, all or almost all of the members of the Charles City Committee allowed to vote had paid the membership fee required to join the Charles City Committee.

104.    Upon information and belief, all or almost all of the Henrico County Committee members allowed to vote had paid the membership fee and, in addition, got pre-approval from the existing membership before being allowed to join the Henrico County Committee.

105.    Pursuant to § 24.2-511(C) of the Code of Virginia, 1950, as amended, the name of the winner was certified by Defendant Jones to the State Board of Elections (hereinafter "SBE") for automatic listing on the Special Election ballot as the official Democratic candidate.   In accordance with § 24.2-511(D) of the Code of Virginia, 1950, as amended, the winner wasn't required to provide petitions containing any signatures of qualified voters to get on the Special Election ballot.

106.    Independent and minor party candidates do not get such an automatic right to be listed on the ballot for any general or special election. They, instead, need to collect and submit the statutorily-mandated number of valid signatures from 74th District residents in order to be listed on the state ballot pursuant to § 24.2-506(A) (4) of the Code of Virginia, 1950, as amended.

## FIREHOUSE PRIMARY IS STATE ACTION

107.    § 24.2-508-510 of the Code of Virginia, 1950, as amended, makes plain the General Assembly's decision to delegate its authority under Article II, § 4 to permit the DPVA to choose the firehouse primary method of nomination.

108.    But it therefore follows that the "party takes its character as a state agency from the duties imposed upon it by state statutes; the duties do not become matters of private law because they are performed by a political party" *Smith v. Allwright*, 321 U.S. 649, 663 (1944).

109.    According to *Smith*, "the privilege of membership in a party…when, as here, that privilege is also the essential qualification for voting in a primary to select nominees for the general election, the State makes the action of the party the action of the state." *Id*, at 664-665.

110.    The basic reasoning in *Smith* has already been applied to the delegation of nominating power by the Virginia General Assembly in the case of *Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996). In discussing *Smith*, the court said the "only difference here is that Virginia has not required its political parties to conduct primary elections to nominate their

candidates. But the right to choose the method of nomination makes the delegation of authority…[an] even greater power over the selection of its nominees." *Id*, at 199.

111.    While *Morse* involved the pre-clearance provision of § 5 of the Voting Rights Act, the Court observed that "[b]y the logic of *Smith*, therefore, the Party [Virginia GOP] acted under the authority of the Commonwealth." *Id*, at 200.

112.    The *Morse* decision further cites *Rice v Elmore*, 165 F. 2d. 387, 390-391 (4th Cir. 1947), in concluding "[s]tate law relating to the general election gives effect to what is done in the primary and makes it just as much a part of the election machinery of the state by which the people choose their officers as if it were regulated by law." *Morse*, supra at 291, fn. 17.

113.    The SBE certified firehouse primary winner Mr. Kevin Sullivan as the official Democratic nominee and gave him an automatic spot on the state ballot as the party's official candidate. Yet the support from the very many thousands of public Democratic party members barred from voting by the firehouse primary rules is the reason the DPVA is recognized as a "political party" pursuant to § 24.2-101 of the Code of Virginia, 1950, and thus giving Mr. Sullivan his automatic right to be on the state ballot pursuant to § 24.2-613 of the Code of Virginia 1950, as amended..

114.    A firehouse primary operates as the "functional equivalent" of a state run primary. *Miller*, supra at 369, fn. 3.

115.    *Smith* said that when the nomination process is an essential part of the electoral system in a state, the law required "applying…the well-established principle of the Fifteenth Amendment, forbidding the abridgement by the State of a citizen's right to vote." *Id* at 666.

116.    "Functional equivalent" is activity sufficiently akin to other activity as to make both subject to the same basic constitutional analysis. *North Carolina Right To Life, Inc., v Leake*, 525 F. 3d 274, 283 (4th Cir. 2008).

117.    Had the General Assembly passed a statute directly permitting the DPVA, operating through the Nominating Committee, to exclude every single African-American not on a local democratic party committee from voting in a nomination process as in the instant case, this law would be deemed unconstitutional on its face according to *Terry v. Adams*, 345 U.S. 461, 469 (1953).

118.    As *Bullock* pointed out, the "rights of voters and the rights of candidates don't lend themselves to neat separation." Id, at 143.

119.    Unlike a citizen's right to vote and exercise the political rights involved with participating in the electoral process, the First Amendment doesn't "recognize candidacy as a "fundamental right" for purposes of constitutional review in a ballot access case. *Clements v. Fashing*, 457 U.S. 957, 963 (1982).

120.    Thus restrictions on voting rights and candidate ballot access are subject to different standards of review depending on the totality of the circumstances. But in either situation, state interests must be "sufficiently weighty to justify the limitation." *Norman v Reed*, 502 U.S. 279, 288-289 (1992).

121.    The state has offered no such weighty justification for the actions of Defendants nor can it.

## DISCRIMINATORY EFFECT FROM INTENTIONAL CONDUCT

122.    The DPVA, operating through the Nominating Committee, wanted to prevent a sizeable, identifiable group of African America Democrats from exercising their right to vote,

their right of political speech, their right of association, and such other rights enabling them to act individually and together in order to choose the individual they wanted as the nominee of their party.

123.    The DPVA, operating through the Nominating Committee, feared that this identifiable group of African-Americans would defy the party leadership and, therefore, had to be excluded from the nomination process. This power to exclude flowed from the delegation of legislative power from the General Assembly. A "State cannot avoid its constitutional responsibilities by delegating a public function to private parties." *Georgia v McCollum*, 505 U.S. 42, 53 (1992).

## STANDING AND RIPENESS

124.    Plaintiffs incorporate the preceding paragraphs as if set forth herein.

125.    Standing and ripeness present the threshold jurisdictional question of whether a court may consider the merits of a dispute." *Elend v. Basham*, 471 F.3d 1199, 1204 (11th Cir. 2006).

126.    Standing addresses whether a party can bring the suit in question. *Flast v Cohen*, 392 U.S. 83, 94-101 (1969).

127.    Standing requires a Plaintiff to demonstrate "an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Doe v. Obama*, 631 F.3d 157, 160 (4th Cir. 2011).

128.   Plaintiff's rights, as incorporated herein, have therefore been trampled upon by Defendants actions in disenfranchising them and those similarly situated in violation of the First Amendment, the Fourteenth Amendment and the Fifteenth Amendments.

129.   Plaintiff Lambert's right to be a candidate has been further trampled upon by the Defendant's arbitrary and capricious effort to impose a grossly excessive filing fee as the only means to get on the nomination ballot.

130.   Plaintiffs were denied their right to not be harmed by the discriminatory effect of those acting under the color of state law in violation of § 2 of the Voting Rights Act.

131.   The damage to Plaintiff's constitutional rights are, therefore, real, and unfixable since the conduct challenged as already taken place.

132.   The injury is directly traceable to the challenged actions.

133.   A favorable decision will absolutely redress the injury.

134.   Ripeness involves the timing of the law suit. *Wilderness Soc'y v. Alcock*, 83 F. 3d 386, 390 (11th Cir. 1996).

135.   The difference between a speculative or abstract question as compared to an actionable "case" or "controversy" is not subject to any definitive test. *Babbitt v. Farm Workers*, 442 U.S. 289, 297 (1979).

136.   Plaintiffs in the instant matter must satisfy "both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise" *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

137.   Plaintiffs satisfy the prudential elements, since they are not raising claims of third parties, are not asking for standing based on generalized grievances, and asserting claims that are "within the zone of interest covered by a statutory conferral of standing." *Elend*, supra at 1206.

138.    Plaintiffs likewise meet the constitutional requirements, for they have suffered an "injury in fact", there is causation between the conduct at issue and the injury, and there is a likelihood the injury in question will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife et al*, 504 U.S.560-561 (1992).

139.    The issues are not moot under the "capable of repetition, yet evading review" standard as applied in appropriate cases, such as the challenge to the burden placed by the State of Illinois on the nomination of certain candidates. *Moore v. Ogilvie*, 394 U.S. 814, 816 (1969).

140.    The "capable of repetition, yet evading review" doctrine is "properly applied in cases involving facial or as-applied challenges to election statutes when election at issue has passed but same questions are likely to arise in future elections." *Miller,* supra at 291, fn.5.

141.    Moreover, pursuant to § 24.2-516 of the Code of Virginia, 1950, as amended, the DPVA, operating through the individuals mentioned in the statute, must notify the SBE in the coming days, but no later than on or about February 17, 2015, whether Plaintiffs and similarly situated Democrats in the 74th District will be allowed to choose their nominee in the state run primary open to all such citizens to be held this coming June, 2015. The DPVA, operating through the individuals mentioned in the statute, will likewise have to notify the SBE of the same decision as regards the other 99 districts in the House and all 40 districts in the Senate. .

142.    The DPVA, operating through the nominating committees created by the Party Plan in all 140 of these election districts, is claiming the authority to replicate the firehouse primary rules adopted in the instant matter, or so disenfranchise and discriminate through different rules producing the same results.

## COUNT I

## Violation of Plaintiffs' First Amendment Rights

143.    Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

144.    Plaintiffs' right to participate in the election process is protected by the First Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment and enforced by 42 U.S.C. § 1983.

145.    The "political franchise of voting" is "regarded as a fundamental political right because [it is] preservative of all rights". *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

146.    "Fencing out" from the franchise a sector of the population because of the way they may vote is constitutionally impermissible." *Carrington v. Rash*, 380 U.S. 89, 94 (1965).

147.    In the exercise of this Article II, § 4 power, the General Assembly must, at all times, adhere to the constitutional and other legal requirements in federal law. *U.S. v Classic*, 313. U.S. 299 (1941).

148.    On or about December 22, 2014, Defendants acted under the color of state law to deprive Plaintiffs of their right to vote, right of political speech, and right to associate as part of the political process, when they refused to allow Plaintiffs the right to vote in the firehouse primary.

149.    The Defendants actions resulted in a violation of the Plaintiffs rights under the First Amendment to the U.S. Constitution, and hence, are liable to Plaintiffs under 42 U. S. C. § 1983.

WHEREFORE, Defendants acts as set forth herein entitle Plaintiffs to (a) such actual and/or nominal damages as may be shown by the evidence, (b) a declaratory judgment that the firehouse primary rules to determine voter eligibility used by the DPVA, operating through the Nominating Committing, violated Plaintiffs rights as guaranteed by the First Amendment to the

U.S. Constitution, (c) injunctive relief enjoining Defendants, their agents and successors, and those acting in concert with them in the future from engaging in such conduct violating the first amendment rights of voters, and (d) an award of such other equitable relief the Court may grant including an award of costs and attorney's fees pursuant to 42 U.S.C. § 1988.

## COUNT II

### Violation of Plaintiffs Due Process Rights Under The Fourteenth Amendment

150.    Plaintiffs incorporate the preceding paragraphs as if set forth herein.

151.    "The right to vote freely for the candidate of one's choice is of the essence of democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds,* supra at 555.

152.    Political rights, such as the right to vote, the right of free speech, the right of association and other rights to participate in the electoral process are protected by the Due Process Clause of the Fourteenth Amendment.

153.    "The Due Process Clause limits the manner and extent to which a state legislature may delegate legislative authority to a private party acting as a state actor." *Biener,* supra at 216.

154.    Since the General Assembly couldn't have passed a law directly granting the DPVA to "set filing fees selfishly, arbitrarily, or based on will or caprice" or to effectively control "the price of admission to the electoral process", the DPVA, operating through the Nominating Committee, lacked any such authority. *Biener,* supra at 216-217.

155.    On or about December 22, 2014, Defendants acted under the color of state law to deprive Plaintiffs of their right to vote and other rights associated with participation in the political process when they refused to allow Plaintiffs the right to vote in the firehouse primary.

156.    The Defendants actions resulted in a violation of the Plaintiffs rights under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and, hence, are liable to Plaintiffs under 42 U. S. C. § 1983.

WHEREFORE the Defendants acts as set forth herein entitle Plaintiffs to (a) such actual and/or damages that may be shown by the evidence, (b) a declaratory judgment that the firehouse primary rules to determine voter eligibility used by the DPVA, operating through the Nominating Committee, violated Plaintiffs rights as guaranteed by the Due Process Clause of the 14th Amendment to the U.S. Constitution, (c) injunctive relief enjoining Defendants, their agents and successors, and those acting in concert with them in the future from engaging in such conduct that violates the due process rights of voters, and (4) such other equitable relief as the Court may find appropriate including an award of costs and attorney's fees pursuant to 42 U.S.C. § 1988.

## COUNT III

### VIOLATION OF PLAINTIFFS EQUAL PROTECTION RIGHTS – VOTER FEES

157.    Plaintiffs incorporate the preceding paragraphs as if set forth herein.

158.    The Equal Protection Clause of the Fourteenth Amendment protects the right to vote. *Harper*, supra. *Harper* banned the use of the poll tax or similar device to deny or help deny citizens the right to vote in the election process.

159.    Plaintiffs, the members of the Charles City Committee, and the members of the Henrico County Committee are all Democrats in the 74th District and considered equal members of the DPVA under the Party Plan.

160.    A monetary fee played a definite role to some degree in ultimately determining voter eligibility in the firehouse primary.

161.    According to *Harper*, a "[s]tate violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or the payment of any fee an electoral standard." *Id*, at 666.

162.    When such a fee is used to cause such unequal treatment between voters, the "degree of the discrimination is irrelevant." Id, at 668.

163.    On or about December 22, 2014, Defendants acted under the color of state law to deprive Plaintiffs of their right to vote and other rights associated with participation in the political process when they conditioned to some extent the right to vote in the firehouse primary on the payment of fee.

164.    The Defendants actions resulted in a violation of the Plaintiffs rights under the Equal Protection Clause of the Fourteen Amendment to the U.S. Constitution and, hence, are liable to are liable to Plaintiffs under 42 U. S. C. § 1983.


WHEREFORE the Defendants acts as set forth herein entitle Plaintiffs to (a) damages of $1000 each, (b) a declaratory judgment that the firehouse primary rules to determine voter eligibility used by the DPVA, operating through the Nominating Committee, used a fee to some degree in ultimately determining who got to vote and therefore violated Plaintiffs rights as guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and, (c) injunctive relief enjoining Defendants, their agents and successors, along with those acting in concert with them in the future from using such fees to violate the equal protection rights of voters, and (4) such other equitable relief as the Court may find appropriate including an award of costs and attorney's fees pursuant to 42 U.S.C. § 1988.

## COUNT IV

### VIOLATIONS OF PLAINTIFFS EQUAL PROTECTION RIGHTS - CLASSES

165.    Plaintiffs incorporate the preceding paragraphs as if set forth herein.

166.    The DPVA, operating through the Nominating Committee, created three unequal classes of voters in the 74th House District. One class consisted of less than 4 dozen local committee officials in Charles City County and Henrico County. The second class consisted of 100% of all Democrats in those two jurisdictions not members in good standing of their respective local committee. A third class consisted of 100% of the 1441 registered voters residing in Richmond's 301 precinct, the overwhelming majority being African American and furthermore African American Democrats. .

167.    On or about December 22, 2014, Defendants acted under the color of state law to deprive Plaintiffs of their right to have all voters treated equally when they instead divided voters in to unequal classes when conducting the voting in the firehouse primary,

168.    The Defendants actions resulted in a violation of the Plaintiffs rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and, hence, are liable to Plaintiffs under 42 U. S. C. § 1983.

WHEREFORE Defendants acts as set forth herein entitle Plaintiffs to (a) such actual and/or damages as may be shown by the evidence, (b) a declaratory judgment that the firehouse primary rules operated to determine voter eligibility used by the DPVA, operating through the Nominating Committee, violated Plaintiffs equal protection rights as guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, and (c) injunctive relief enjoining Defendants, their agents and successors, along with those acting in concert with them in the future from employing such classifications to violate the equal protection rights of

voters, and, (d) such other equitable relief as the Court may award including an award of costs and attorney's fees pursuant to 42 U.S.C. § 1988.

<u>COUNT V</u>

**VIOLATION OF PLAINTIFFS EQUAL PROTECTION RIGHTS - WEIGHT**

169.   Plaintiffs incorporate the preceding paragraphs as if they were set forth herein.

170.   "When a State makes a classification of voters which favor residents of some counties over residents of other counties, a justiciable controversy is presented." *Moore v. Ogilvie,* 394 U.S. 814, 817 (1969).

171.   "The right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise" declared *Bush v Gore,* 531 U.S. 98, 105 (2000) citing *Reynolds,* supra at 555.

172.   "Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote...wherever there home may be in that geographical unit" declared *Gray v. Sanders,* 372 U.S. 368, 379 (1963). .

173.   The voter eligibility device used by the DPVA, operating through the Nomination Committee, unconscionably underweighted the voters, mostly African American, in Henrico County, giving them rough parity with Charles City County despite Henrico having close to 900% more registered voters. This is not permitted in a "preliminary election" any more than in a general election. *Gray,* supra at 380.

174.   The voter eligibility device used by the DPVA, operating through the Nomination Process, unconscionably gave the ultimate underweighting – total elimination – to all the registered voters in the one Richmond City precinct.

175.    On or about December 22, 2014, Defendants acted under the color of state law to deprive Plaintiffs of their right to vote and to have their votes equally counted when they instead used a weighing system which grossly undervalued the proper constitutional weight to be given voters in Henrico County and completely disenfranchised every voter in the City of Richmond.

176.    The Defendants actions resulted in a violation of the Plaintiffs rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and, hence, are liable to Plaintiffs under 42 U,S.C. § 1983.

WHEREFORE, the Plaintiffs acts as set forth herein entitle Plaintiffs to (a) such actual and/or nominal damages that may be shown by the evidence, (b) a declaratory judgment that the firehouse primary rule determine voter eligibility resulted in a proportional weight given to Charles City County, Henrico County and City of Richmond voters that violated Plaintiffs rights of equal protection as guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, and (c) injunctive relief enjoining the Defendants, their agents and successors in office and those acting in concert with them in the future from engaging in such conduct that violates the equal protection rights of voters, and (d) such other equitable Relief as the Court may provide including an award of costs and attorney's fees pursuant to 42 U.S. § 1988.

## COUNT VI

## VIOLATION OF PLAINTIFFS FIFTEENTH AMENDMENT RIGHTS

177.    Plaintiffs incorporate the preceding paragraphs as if they were set forth herein.

178. The Fifteenth Amendment forbids a State from denying a citizen the right to vote on the basis of race. *Smith*, supra.

179. Plaintiffs Lambert, Gray Hill and Linda Hill are African American.

180. They were among the identifiable group of African Americans – not members of a local democratic committee – that the DPVA, operating through the Nominating Committee, knowingly designed the firehouse primary rules to 100% disenfranchise.

181. The DPVA, operating through the Nominating Committee, feared this group of African Americans, who were not members of a local democratic party, might use their First Amendment rights to support a candidate the DPVA and other local party officials didn't want to win the Democratic nomination. Therefore the firehouse primary rules were intentionally designed to disenfranchise them all.

182. On or about December 22, 2014, Defendants acted under the color of state law to deprive Plaintiffs of their right not to have their right to vote denied or abridged on account of color when they refused to allow Plaintiffs the right to vote in the firehouse primary.

183. The Defendants actions resulted in a violation of the Plaintiffs rights under the Fifteenth Amendment to the U.S. Constitution and, hence, are liable to Plaintiff's under 42 U.S.C. § 1988.

WHEREFORE, Defendants acts as set forth herein entitle Plaintiffs to (a) such actual and/or nominal damages as may be shown by the evidence, (b) a declaratory judgment that the firehouse primary rules to determine voter eligibility used by the DPVA, operating through the Nominating Committee, violated Plaintiffs right to vote through the use of rules intentionally designed to disenfranchise an identifiable group of African American voters contrary to the Fifteenth Amendment to the U.S. Constitution, and (c) injunctive relief enjoining Defendants,

their agents and successors, and those acting in concert with them in the future from engaging in such conduct that violates the Fifteenth Amendment rights of voters, and (d) such other equitable relief as the Court may award including an award of costs and attorney's fees pursuant to 42 U.S. C. § 1988.

## COUNT VII

### VIOLATION OF LAMBERT'S BALLOT ACCESS RIGHT - FEE

184.    Plaintiff Lambert incorporates the preceding paragraphs as if set forth herein.

185.    Lambert's right to have his name on the nomination ballot is protected by the First Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment to the U.S. Constitution and enforced by 42 U.S.C. § 1983. *Anderson v Celebreeze*, 460 U.S. 780 (1983).

186.    Lambert's rights were denied by the DPVA, acting through the Nominating Committee, imposing an unreasonable, mandatory, nonrefundable $1500 filing fee, equal to approximately 8.5% of the official salary of the office being sought, to gain access to the firehouse primary ballot.

187.    The DPVA's actions amount to "state action" according to *Bullock v. Carter*, 405 U.S. 134, 140-141 (1972).

188.    On or about December 20, 2014, Defendants acted under the color of state law to deprive Plaintiff Lambert of his right to access the firehouse primary ballot when they refused to allow Lambert the right to be a candidate in the firehouse primary voting to take place on December 22, 2014 unless he paid an unreasonable, mandatory, nonrefundable $1500 filing fee.

189.    The Defendants actions resulted in a violation of Plaintiff Lambert's rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and, hence, are liable to Plaintiff Lambert under 42 U.S.C. § 1983

WHEREFORE, Defendants acts as set forth herein entitle Plaintiff Lambert (a) such actual and/or nominal damages as may be shown by the evidence, (b) a declaratory judgment that requiring a mandatory nonrefundable $1500 filing fee equal to approximately 8.5% of the annual salary of the office sought is an unreasonable fee that violated Plaintiff Lambert's candidate rights as guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, and (c) injunctive relief enjoining Defendants, their agents and successors, and those acting in concert with them in the future from requiring such an unreasonable fee for gaining access to the firehouse primary ballot, and (d) such equitable relief as the Court may provide including an award of costs and attorney's fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT VIII

### VIOLATION OF LAMBERT'S BALLOT ACCESS RIGHT - MEANS

190. Plaintiffs incorporate the preceding paragraphs as if set forth herein.

191. Plaintiff Lambert's rights as guaranteed by the Equal Protection Clause of the 14th Amendment were violated by the DPVA, operating through the Nominating Committee, imposing a $1500 filing fee, equal to approximately 8.5% of the official salary for the office sought, without at the same time providing a reasonable alternate means for a candidate to qualify for the firehouse primary ballot.

192. The DPVA, operating through other nominating committees, has regularly and continually used the delegation of public power from the General Assembly to impose such excessively large filing fees in other nomination contests.

193. On or about December 20, 2014, Defendants acted under the color of state law to deprive Plaintiff Lambert of right to access the firehouse primary ballot when they refused to

allow Lambert the right to be a candidate in the firehouse house primary voting because he refused to pay their mandatory, nonrefundable $1500 filing fee without their having provided an alternate, reasonable means for him to get on the ballot.

194.    The Defendants actions resulted in a violation of Plaintiff Lambert's rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and, hence, are liable to Plaintiff Lambert under 42 U.S.C. § 1983.

195.    WHEREFORE, Defendants acts as set forth herein entitle Plaintiff Lambert to (a) such actual and/or nominal damages as may be shown by the evidence, (b) a declaratory judgment that requiring a non-refundable $1500 filing fee, approximately 8.5% of the official salary of the office sought in order to get on the ballot, without at the same time providing a reasonable, alternate means to get on the firehouse primary ballot, violated Plaintiff Lambert's candidate rights as guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, and (c) injunctive relief enjoining Defendants, their agents and successors, and those acting in concert with them in the future from requiring such a 8.5% filing fee without, at the same time, providing a reasonable, alternate means to gain access to the firehouse primary nomination ballot and (d) such equitable relief as the Court may provide including the award of costs and reasonable attorney's fees pursuant to  42 U.S.C. § 1988.seballot

## COUNT IX

## VIOLATION OF § 2 OF THE VOTING RIGHTS ACT – VOTERS

196.    Plaintiffs incorporate the preceding paragraphs as if set forth herein.

197.    Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, prohibits the enforcement of any standard, practice or procedure that has either the purpose or the result of denying or abridging the right to vote on account of race.

198.    The Voting Rights Act covers methods of nominations conducted by Virginia political parties, not merely the state run direct primary. *Morse,* supra at 209.

199.    At all times, the DPVA, operating through the Nominating Committee, knew the a standard, practice or procedure contained within the firehouse primary rules and adopted to govern the conduct of the firehouse primary – to wit, limiting the right to vote to only about 4 dozen members of the Charles City Committee and the Henrico County Committee – would disenfranchise Plaintiffs and others similarly situated African American Democrats residing in the 74th District.

200.    At all times, the DPVA, operating through the Nominating Committee, knew the a standard, practice or procedure contained within the firehouse primary rules and adopted to govern the conduct of the firehouse primary – to wit, limiting the right to vote to only about 4 dozen members of the Charles City Committee and the Henrico County Committee - would have a discriminatory effect against Plaintiffs and those similarly situated, indeed this standard, practice or procedure been knowingly designed to have the penultimate discriminatory effect, totaling wiping out the right to vote and participate for an identifiable group of African Americans consisting of tens of thousands of citizens who the DPVA, operating through the Nominating Committee, feared might exercise their First Amendment political rights to choose a candidate not favored by DPVA officials.

201.    The identifiable group of excluded African Americans – those who are considered public Democratic Party members and local committee officials - make up over 99% of all the African Americans in the District, and over 99% of all African America Democrats in the 74th while those local committee officials allowed to vote consist of far less than 1% of the voters.

202.    Viewed in the totality of the circumstances, these discriminatory standards, practices or procedures resulted in a denial or abridgement of the very equal opportunities for an identifiable group of African American voters to participate in the political process in violation of Section 2.

203.    On or about December 22, 2014, Defendants acted under the color of state law to deprive Plaintiffs of their right to vote and to be free from discrimination when participating in the political process by their using a standard, practice or procedure in connection with the firehouse primary voting that would disenfranchise Plaintiffs and otherwise subject an identifiable group of African American voters to such consequential discrimination. Defendants intentionally used said standard, practice or procedure to deny these protected voters their right to vote in the firehouse primary voting process even though Defendants knew that such disenfranchisement and consequential discrimination would result.

204.    The Defendants action resulted in a violation of the Plaintiffs rights secured by § 2 of the Voting Rights Act, and hence, are liable to Plaintiff under 42 U.S.C. § 1983.

WHEREFORE, Defendants acts as set forth herein entitle Plaintiffs to (a) such actual and/or nominal damages that may be shown by the evidence, (b) a declaratory judgment that the use by the DPVA, operating through the Nomination Committee, of a standard, practice or procedure to disenfranchise African American voters violates Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, and (c) injunctive relief enjoining Defendants, their agents and successors in office and all persons acting in concert with them in the future from using such a standard, practice or procedure to disenfranchise and otherwise discriminate against protected voters, and (d) such other equitable relief as the Court may provide including an award of costs and attorney's fees as permitted by  42 U.S.C. § 1973*l*(e).

## COUNT X

## VIOLATION OF §SECTION 2 OF THE VOTING RIGHTS ACT - WEIGHT

205.    Plaintiffs incorporate the preceding paragraphs as if set forth herein.

206.    DPVA, operating through the Nominating Committee, fixed the representation between eligible voters in the three 74th District jurisdictions by the use of standard, practice or procedure contained in the firehouse primary rules that created a relative weighting in fundamental violation of the rightful constitutional proportion. *Reynolds*, supra.

207.    At all times, the DPVA, operating through the Nominating Committee, knew this standard, practice or procedure contained in the firehouse primary rules would so discriminate against the Plaintiffs and those similarly situated in Henrico County or the City of Richmond.

208.    Upon information and belief, the DPVA, operating through the Nominating Committee, intentionally designed this standard, practice or procedure contained in the firehouse primary rules – to wit, limiting eligibility to members of the three local party committees residing in the 74th District – to impose this severe discriminatory effect and penultimate abridgement or denial of the right to vote on an identifiable group of African American Democratic voters in order to prevent them from exercising their First Amendment political rights to nominate the candidate of their choice.

209.    Viewed in the totality of the circumstances, enforcement of such a standard, practice or procedure through the firehouse primary rules resulted in a denial or abridgement of equal opportunities for this identifiable group of African American voters to participate in the political process in violation of Section 2 of the Voting Rights Act.

210.    On or about December 22, 2014, Defendants acted under the color of state law to deprive Plaintiffs of their right to vote and to be free from discrimination when participating in

the political process by their using a standard, practice or procedure in connection with the firehouse primary voting that would disenfranchise Plaintiffs and otherwise subject an identifiable group of African American voters to such consequential discrimination. Defendants intentionally used said standard, practice or procedure to deny these protected voters their right to vote in the firehouse house primary voting process even though Defendants knew that such disenfranchisement and consequential discrimination would result.

211.    The defendants action resulted in a violation of Plaintiffs rights secured by § 2 Voting Rights Act, and, hence, are liable to Plaintiffs under 42 § 1983.

WHEREFORE, defendants acts as set forth herein entitle Plaintiffs to (a) actual and/or nominal damages that may be shown by the evidence, (a) a declaratory judgment that the use by the DPVA, operating through the Nominating Committee, of a standard, practice or procedure contained in the firehouse primary rules that severely underweights the rightful proportion of African American voters in Henrico County and Charles City County, knowing the resulting discriminatory effect, violates § 2 of the Voting Rights Act, and (c) injunctive relief enjoining Defendants, their agents and successors in office, along with those acting in concert with them in the future from using such a standard, practice or procedure to disenfranchise and otherwise discriminate against protected voters, and (d) such other equitable relief as the Court may provide including an award of costs and attorney's fees as provided by 42 U.S.C. § 1973*l*(e).

.

## COUNT XI

### VIOLATON OF § 2 OF THE VOTING RIGHTS ACT – TOTAL SUPPRESSION

212.    Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

213.   There are roughly 1441 registered voters in Richmond's # 301 precinct. It is part of the 74th District. They are overwhelmingly Democratic and considered members of the party by the Party Plan.

214.   Plaintiff Linda Hill lives in the 74th House District.

215.   At all times, the DPVA, operating through the Nominating Committee, knew, or knowingly accepted the possibility, that a standard, practice or procedure contained in the firehouse primary rules disenfranchised **every single one** of these voters from participating in the nomination process.

216.   Plaintiff Hill and her fellow citizens in the 74th District have therefore suffered the penultimate voter dilution, the penultimate retrogression and the penultimate discriminatory effect. Their right to vote has been intentionally wiped out.

217.   Viewed in the totality of the circumstances, enforcement of such a standard, practice or procedure, through the firehouse primary rules resulted in a denial or abridgement of equal opportunities for this identifiable group of African American voters to participate in the political process in violation of Section 2 of the Voting Rights Act.

218.   This is precisely the type of standard, practice or procedure used in a nomination process and leading to the ultimate discrimination against a protected group's right to vote intended to be prevented by the Voting Rights Act.

219.   On or about December 22, 2014, Defendants acted under the color of state law to deprive Plaintiff Hill her right to vote and to be free from discrimination when participating in the political process by their intentionally using a standard, practice or procedure in connection with firehouse primary voting that would disenfranchise Plaintiff Hill, along with every other voter in Richmond, and otherwise subject an identifiable group of African American voters to

such discrimination. Defendants intentionally used said standard, practice or procedure to deny these protected voters their right to vote in the firehouse primary voting process even though Defendants knew that such disenfranchisement and consequential discrimination would result.

220.    The Defendants actions resulted in a violation of Plaintiff Hill's rights secured by § 2 of the Voting Rights Act, and, hence, are liable to Plaintiffs under 42 U.S.C. § 1983.

WHEREFORE, Defendants' acts as set forth herein entitle Plaintiffs to (a) such actual and/or nomination damages that may be shown by the evidence, (b) a declaratory judgment that the use of by the DPVA, operating through the Nominating Committee, of a standard, practice or procedure contained in the firehouse primary rules to completely disenfranchise all the voters in a jurisdiction, and knowingly discriminate against such voters violates § 2 of the Voting Rights Act, and (c) injunctive relief against Defendants, their agents and successors, and those acting in concert with them in the future from using such a standard, practice or procedure to disenfranchise and otherwise discriminate against protected voters, and (d) award of attorney's fees and costs pursuant to 42 U.S.C. § 1973*l*(e).

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that this Court hear this action pursuant to 42 U.S.C. §§ 1973, *et seq.* and 1983; and that the Court provide the following relief:

(A) As to Count I, a Declaratory judgment that the firehouse primary rule defining voter eligibility violated the First Amendment to the U.S. Constitution and, in addition, injunctive relief to enjoin Defendants, their agents and successors, and those acting in concert with them in the future from engaging in such future conduct.

(B) As to Count II, a Declaratory judgment that the firehouse primary rule defining voter eligibility violated the Due Process Clause of the 14th Amendment to the U.S. Constitution and, in addition, injunctive relief to enjoin Defendants, their agents and successors, and those acting in concert with them in the future from engaging in such future conduct.

(C) As to Count III, a Declaratory judgment that the firehouse primary rule defining voter eligibility used to some degree a fee in determining who got to vote in violation of the Equal Protection Clause of the 14th Amendment to the U.S. Constitution and, in addition, injunctive relief to enjoin Defendants, their agents and successors, along with those acting in concert with them in the future from engaging in such future conduct.

(D) As to Count IV, a Declaratory judgment that the firehouse primary rule dividing voters into the 3 unequal classes demonstrated herein violates the Equal Protection Clause of the 14th Amendment to the U.S. Constitution and, in addition, injunctive relief to enjoin Defendants, their agents and successors, along with those acting in concert with them from imposing such unreasonable mandatory filing fees in the future.

(E) As to Count V, a Declaratory judgment that the firehouse primary rule defining rule grossly underweighting the power of the voters in Henrico County and wiping out any

participation whatsoever from voters in the City of Richmond creates a proportional equation in violation of the Equal Protection Clause of the 14th Amendment and, in addition, injunctive relief to enjoin Defendants, their agents and successors, along with those acting in concert with them in the future from imposing such a rule in the future.

(F) As to Count VI, a Declaratory judgment that the firehouse primary rule defining voter eligibility disenfranchised voters on the basis of race in violation of the Fifteenth Amendment and, in addition, injunctive relief to enjoin Defendants, their agents and successors, along with those acting in concert with them in the future from imposing such a rule in the future.

(G) As to Count VII, a Declaratory judgment that the imposition of a mandatory, nonrefundable $1500 filing fee equal to approximately 8.5% of the official salary of the office sought in order to get on the nomination ballot violates the Equal Protection Clause of the U.S. Constitution, and, in addition, injunctive relief enjoining the Defendants, their agents and successors, and those acting in concert with them from imposing in the future any $1500 filing fee when equal to 8.5% of the official salary of the office sought

(H) As to Count VIII, a Declaratory judgment that the imposition of a $1500 filing fee equal to approximately 8.5% of the official salary of the office sought in order to get on the nomination ballot without providing a reasonable, alternate means to get on said nomination ballot violates the Equal Protection Clause of the U.S. Constitution and, in addition, injunctive relief to enjoin Defendants, their agents and successors, and those acting in concert with them in the future from imposing in the future such a filing fee

equal to 8.5% without providing a reasonable, alternate means to get on the nomination ballot.

(I) As to Count IX, a Declaratory judgment that the use of a standard, practice or procedure under the color of state law intentionally designed to disenfranchise and subject to discrimination over 99% of all African Americans in an electoral district and indeed disenfranchise and otherwise subject to discrimination 100% of all African America in an identifiable group violates Section 2 of the Voting Rights Act of 1965, and, in addition, injunctive relief enjoining Defendants, their agents and successors, and those acting in concert with the in the future from using such standard, practice or procedure.

(J) As to Count X, a Declaratory judgment that the use of a standard, practice or procedure under the color of state law intentionally designed to severely dilute the voting power of a jurisdiction that is part of an electoral district and completely wipe out the voting power of another jurisdictional part of an electoral district and further knowing such action will subject an identifiable group of African Americans to resulting consequential discrimination violates Section 2 of the Voting Rights Act and, in addition, injunctive relief enjoining Defendants, their agents and successors, along with those acting in concert with them from using such a standard, practice or procedure in the future.

(K) As to Count XI, a Declaratory judgment that the intentional use of a standard, practice, or procedure under the color of state law that totally disenfranchises all the voters of a jurisdictional part of an electoral district, such voters overwhelmingly African American, and subjecting such voters to the resulting discrimination violates Section 2

of the Voting Rights Act and, in addition, injunctive relief enjoining the Defendants, their agents and successors, and those acting in concert with them in the future from using such a standard, practice or procedure.

(2) Such actual and/or nominal damages as shown by the evidence.

(3) Such other and/or additional relief as equity may require, including but not limited to an award of its costs herein expended, including reasonable attorney's fees pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 1973*l*(e).

Plaintiffs hereby request a hearing on this matter.

DAVID LAMBERT, GARY HILL, LINDA HILL

By: _____
                              Counsel

J. Paul Gregorio, Esquire (VSB#39829)
INNSBROOK LAW GROUP, P.C.
P.O. Box 4170
Glen Allen, Virginia 23059
804-935-3096
804-935-3091 fax
*Attorney for Plaintiffs*